tion for reinstatement as a member, which application was rejected. He made no further tender of dues after the alleged tender of the July dues, and he died in the following December.

The principal questions involved on this appeal are: First. Was the alleged tender of the $5.70 on July 17, 1908, for the July dues, a sufficient tender, unaccompanied by the further amount of $5.70 advanced by the section secretary to the assured, and paid by him for the assured for the dues of June, 1908? Second. In view of such tender, was the suspension of the assured and the forfeiture of his membership a legal forfeiture under the by-laws of the lodge?

As to these two propositions, it seems clear that, the defendant having received the money for the June dues from the section secretary as a payment of the June dues, the tender of the July dues was a sufficient tender. The defendant had no right under the by-laws to refuse to accept the same, and in view of such tender there was no authority under the by-laws for the suspension of the assured and the forfeiture of his membership for nonpayment of dues. The question then arises whether, in view of such illegal suspension and forfeiture of the membership of the assured, any duty rested upon him to make further tender of dues for each succeeding month up to the time of his death. On this point the ruling of the trial judge that no further tender could be required of the assured is supported by abundant authorities. In Hall v. Supreme Lodge, Knights of Honor (D. C.) 24 Fed. 450, the rule applicable to such cases is clearly stated:

"A tender of an assessment, * * * which is refused, is just as effectual * * * as if it had been accepted. The burden to act after tender and refusal is on the creditor, and the debtor is only required to be ready to meet the demand when made."

In Hayner v. American Popular Life Insurance Company, 69 N. Y. 435, the court held "that, where the one entitled to the payment of money virtually declares that no tender will be accepted," the law does not require a tender, as it would be useless and of no avail.

The various exceptions taken to the rulings of the court and the refusal to charge various requests are dependent upon the determination of these propositions, and the rulings on these points were correct.

The judgment should therefore be affirmed, with costs. All concur.

---

(138 App. Div. 190.)

### CARPENTER et al. v. HOADLEY.

(Supreme Court, Appellate Division, First Department. May 13, 1910.)

1. BILLS AND NOTES (§ 359*)—BONA FIDE HOLDER FOR VALUE.

Plaintiffs were not the bona fide holders for value of a note made by M. to his own order and indorsed by defendant, so as to deprive defendant of a defense otherwise available; they having parted with nothing in consideration thereof, but having held a claim for an antecedent debt either against defendant, which he denied, or against M., which they did not release on receiving the note from M.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 924–936; Dec. Dig. § 359.*]

2. BILLS AND NOTES (§ 64*)—CONDITIONAL DELIVERY.

Plaintiffs holding a claim against M. or defendant, defendant, though denying liability, proposed to, and did, intrust to M. the selling of stock owned by defendant, with authority to M. to pay the claim from the proceeds thereof. He also indorsed notes made by M. to his own order for the amount of the claim and delivered them to M. on the agreement made by M., on behalf of plaintiffs, with him, that M. would keep them in his possession as evidence of M.'s authority to apply, in payment of the notes, money received on sale of the stock; and that the notes would be held and the proceeds of such sales applied on their payment; and that defendant would not be compelled to pay anything on them otherwise than out of the proceeds of such sales. *Held*, that such conditional delivery was a good defense to an action on the notes.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 104; Dec. Dig. § 64.*]

3. BILLS AND NOTES (§ 517*)—CONDITIONAL DELIVERY—EVIDENCE.

Recital in a contract between defendant and M., made some time after delivery of notes by defendant to M. and their transfer by M. to plaintiffs, of the condition on which the notes had been delivered, being but a mere recital of what the contract accompanying the delivery was, is but one piece of evidence, in the shape of an admission, not conclusive against defendant's testimony as to what the condition was.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1807–1815; Dec. Dig. § 517.*]

4. APPEAL AND ERROR (§ 268*)—EXCEPTIONS—JUDGMENT NOTWITHSTANDING VERDICT.

The judgment for plaintiffs on a verdict directed for them, notwithstanding the special verdict, finding facts not authorizing it, cannot be sustained because of one piece of evidence appearing to bear in plaintiffs' favor; there being no exception permitting review of the verdict on the facts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1596–1608; Dec. Dig. § 268.*]

Ingraham, P. J., and McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Nathaniel L. Carpenter and others against George W. Hoadley, impleaded with another. From a judgment on a general verdict directed for plaintiffs on the special verdict, defendant Hoadley appeals. Reversed and directed.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, McLAUGHLIN, and DOWLING, JJ.

John H. McCrahon, for appellant.
Edmund L. Mooney, for respondents.

SCOTT, J. The defendant Hoadley appeals from a judgment entered upon a verdict for the plaintiffs directed by the court. The appellant is sued as indorser upon promissory notes made by the defendant Maloney to his own order, and indorsed by the appellant. The plaintiffs are stockbrokers. Maloney, who, although named as a defendant, has not been served with process, was the manager of their branch office at Boston, Mass. The appellant resided at Providence. Some time in July, 1906, Maloney opened a speculative account for account of appellant, under the wholly fictitious title of "Fred Williams, Special." It is not made clear whether appellant in the first

instance authorized the opening of this account; but it is clear that he soon knew of it and received notices concerning it from time to time. He was not required to put up any margin. The account ran along until about August 25, 1906, when it showed a small loss of about $100. Appellant's testimony is that on this date he notified Maloney by telephone to close the account out, and at the same time repudiated any responsibility for it or interest in it. Maloney's story is that he did receive a telephone message from appellant, but his understanding was that he was to continue to trade in the account according to such instructions as he might receive from plaintiffs' New York house. Appellant went off on a journey and appears to have had nothing further to do with the account or knowledge as to what Maloney was doing with it. Maloney did not close it out. Some time during the month of September, there was a sharp and sudden rise in the price of cotton (with which the account dealt), and the account was closed out at a loss of several thousand dollars. Demand was made upon appellant for the amount of the deficit, which he refused to pay, disclaiming any responsibility. Plaintiffs then declared that, unless appellant assumed responsibility, the loss would fall upon Maloney, and that he would be discharged from his position.

Appellant, in order to relieve Maloney, and still disclaiming any responsibility on his own part, proposed that he should intrust Maloney with the selling of a large amount of mining stock, in which he was interested, and that Maloney might pay the amount of the loss out of the first proceeds of the sale of such stock. He also, at Maloney's solicitation, indorsed the notes in suit. Maloney started in to sell the mining stock, using plaintiffs' letter heads to solicit purchases. Owing to objection on the part of the officers of the New York Stock Exchange, Maloney was directed to discontinue the use of plaintiffs' name in connection with the marketing of the mining stock, but was authorized to undertake to market it in his own name, on condition that he turn over to plaintiffs the notes involved in this action, and which he had up to that time retained in his own possession. This was on November 23, 1906, nearly two months after the execution of the notes. The defense is that the notes were delivered to Maloney upon condition that they were to remain in his possession and control; that they were to be paid solely out of the proceeds of the sale of the mining stock above mentioned; and that appellant was in no event to be held personally liable for their payment.

This defense, if established, was available to appellant as against the plaintiffs. They were not bona fide holders for value, for they had parted with nothing in consideration of the notes. They held a claim against either the appellant or Maloney—against appellant if he was legally responsible for the account, which he always denied; against Maloney if he had carried on the account in the face of appellant's instructions to close it out, and without plaintiffs' consent. In either case, their claim was for an antecedent debt, which they did not release upon receiving the notes. The question of appellant's liability upon the account was not litigated. The court submitted to the jury certain specific questions, which, as the record shows, were carefully

formulated by agreement between counsel for both parties. The questions and the answers given by the jury were as follows:

"Q. Was it agreed by Maloney with Hoadley, at the time the notes in suit were given, that he (Maloney) would keep the notes in his possession as evidence of Maloney's authority to apply the money received on the sale of the stock of the Cathedral Mining Company in payment of said notes; that the notes would be held and the proceeds of such sales applied to their payment, and Hoadley not be compelled to pay anything on them otherwise than out of the proceeds of such sales? A. Yes.

"Q. If you find that Maloney made such promise or agreement, did he make it on behalf of Carpenter, Baggot & Co., or as his own personal promise or agreement? A. Yes, Carpenter, Baggot & Co."

The special verdict thus found by the jury was not objected to in any way, and no motion was made to set it aside. There was evidence to sustain it, and the findings of fact thus found stand as the undisputed facts of the case. Notwithstanding the special verdict, the court directed a verdict in favor of plaintiffs.

The question which we have to consider is, therefore, whether the facts thus found constitute a defense to the action. The first question submitted to and answered by the jury is substantially identical with that which was submitted in Andrews v. Hess, 20 App. Div. 195, 46 N. Y. Supp. 796, the affirmative answer to which was held to establish a defense. In that case the rule was recognized, which has been stated in one form or another in many cases, that, when the delivery of a note is limited by the conditions upon which the delivery was made, the performance of these conditions is essential to the validity of the notes. In Benton v. Martin, 52 N. Y. 570–574, the rule is thus stated:

"Instruments, not under seal, may be delivered to the one to whom upon their face they are made payable, or who by their terms is entitled to some interest or benefit under them, upon condition, the observance of which is essential to their validity; and the annexing of such condition to the delivery is not an oral contradiction of the written obligation, though negotiable, as between the parties to it or others having notice. It needs a delivery to make the obligation operative at all, and the effect of the delivery and the extent of the operation of the instrument may be limited by the condition with which delivery is made. And so also, as between the original parties and others having notice, the want of consideration may be shown."

To the same effect are many other authorities, in one of which the words quoted above are adopted and reiterated. Higgins v. Ridgway, 153 N. Y. 130, 47 N. E. 32. In Jamestown Business College Ass'n v. Allen, 172 N. Y. 291, 64 N. E. 952, 92 Am. St. Rep. 740, a very different question was presented. In that case the defense relied upon was that the note was to become void upon the happening of a future event. The court pointed out very clearly the distinction between such a case and one like that which we have to consider, saying:

"Had the parties agreed that the note should not be regarded as completely delivered until the defendant should take such instructions, or until she could sell her scholarship, it would not have become operative until either of these events had transpired. The agreement which the parties did make was just the reverse of that. The note is stated to have been actually and unconditionally delivered, and was to be and remain a note until the defendant should decide either to sell the scholarship, if that were possible, or to abandon the projected course of instruction. * * * That was not a conditional delivery

which held the consummation of the contract in abeyance, but an absolute delivery which, as the defendant supposed, could be annulled, in a certain contingency, at her option. It is obvious, therefore, that there is a radical distinction between a conditional delivery, which is not to become complete and effective until the happening of some condition precedent, and a complete delivery, like the one at bar, which is sought to be defeated by subsequent contingencies which may or may not arise. In the one case, there is no contract until the condition has been complied with; in the other, there is a binding contract, not withstanding the happening of the contingency relied upon to defeat it."

The verdict of the jury in the case at bar has established it as a fact, undisputed upon the record, that the delivery of the note sued upon was a conditional one, and that the rule of Higgins v. Ridgway, supra, and other like cases, applies, and not the rule in the Jamestown Business College Ass'n Case. The contingency upon which it was to become valid and binding never arose, and hence no personal liability upon the note ever arose against the appellant in favor of Maloney, or of the plaintiffs, who, not being holders for value, are in no better position than he. The defense upon which appellant relied was, therefore, sufficient, and was established by the special verdict, which, as the record comes to us, we cannot review.

Our attention has been called to a written contract between Maloney and the appellant, dated about two months after the notes had been delivered and after they had come into the possession of the plaintiffs, which states the condition upon which the notes had been delivered somewhat differently from the statement made by appellant in his testimony. This paper does not purport to be the contract which accompanied the delivery of the notes, but a later recitation of what the contract was. At most, it was only one piece of evidence, in the shape of an admission by Hoadley, to be considered by the jury in determining what the real agreement was. As there is no exception permitting us to review the verdict upon the facts, we cannot sustain the judgment merely because of one piece of evidence which appears to bear in plaintiffs' favor.

It follows that the judgment appealed from must be reversed, and judgment directed upon the special verdict in favor of the appellant, with costs to the appellant in this court and in the court below, including the special allowance which it was stipulated upon the trial should follow the judgment.

CLARKE and DOWLING, JJ., concur.

INGRAHAM, P. J. (dissenting). As the result of an agreement between the defendant and one Maloney, the terms of which will be hereafter referred to, the defendant prepared three promissory notes, each of which were dated October 1, 1906, which Maloney promised to pay to the order of himself $2,268.33, value received, with interest at 6 per cent. from date, one of which was payable four months after date and one payable eight months after date. Maloney indorsed the notes, the defendant Hoadley indorsed them, and they were delivered to Maloney. Two of these notes were subsequently transferred to the plaintiffs, and to recover on those two notes this action was brought.

The defendant interposed an answer admitting the indorsement of the notes sued on, alleging that at the time of the indorsement the plaintiffs were brokers dealing in cotton at the New York Cotton Exchange and maintained an office in the city of Boston, which was in charge of Maloney, setting up certain transactions in cotton in the name of "Fred Williams, Special," in which Maloney made trades in cotton by making purchases and sales from time to time in accordance with the dictates of his own judgment for the account of the defendant and for his benefit; that prior to the indorsement of the notes Maloney had told the defendant that he had opened an account in a fictitious name for the benefit of the defendant, who was to receive the proceeds, but was not and should not be called upon or required to make deposits of margins, and should not in any event be called upon or liable to pay any money for losses if there should be any; that defendant had repudiated such account, and did not advance any money on margins, and did not give the plaintiffs, directly or through Maloney, any orders for the purchase or sale of cotton, and directed Maloney to close out the account, or do anything else in relation to it that Maloney or the plaintiffs desired; that the defendant was the owner of a large amount of the capital stock of mining and smelting company; that previous to the 1st of October, 1906, the defendant made an arrangement with Maloney, whereby Maloney was to try to sell some of the said mining stock; that on or about the 1st of October the plaintiffs demanded a settlement of this special account from Maloney, who, not being able to pay the amount of the indebtedness, offered to give the plaintiffs promissory notes aggregating the total amount of the loss on said account, and plaintiffs agreed and promised to accept said notes provided Maloney would procure the indorsement of the defendant thereon; that thereupon Maloney applied to the defendant to indorse said notes; that defendant agreed with the plaintiffs and with Maloney that for the accommodation of Maloney and the plaintiffs, and for the further purpose of indicating his assent to the application of the proceeds of sale of the mining stock to the payment of the notes he would indorse said notes upon condition that payment thereof should only be made out of the proceeds of the sales of the said shares of mining stock as said sales should be made by Maloney, the sum to be paid being a part or portion of the commissions that Maloney would be entitled to receive from the defendant for the sale of shares of the mining stock; that Maloney and the plaintiffs promised the defendant that, if he would so indorse the notes as aforesaid, payment thereof should be made out of the proceeds of such sale of mining stock as aforesaid, and in no other way should payment of said notes be demanded or sought to be enforced against the defendant; that defendant indorsed said notes relying upon said promise and agreement; that Maloney never did sell any material portion of the mining stock and never did apply the proceeds of the sale of the mining stock to the payment of the said notes or any of them.

This answer therefore admits the indorsement and delivery of the note in question, stating as a defense that it was on condition that the notes should not be paid as by their terms provided, but should be

paid out of the proceeds of the sale of the mining stock. The jury found, in answer to a special question submitted to it, that it was agreed by Maloney with the defendant, at the time the notes in suit were given, that he would keep the notes in his possession as evidence of his (Maloney's) authority to apply the money received on the sale of said mining stock in payment of the said notes; that the notes would be held and the proceeds of such sales applied to their payment, Hoadley not to be compelled to pay anything on them otherwise than out of the proceeds of the sale of such stock; and also that Maloney made such promise or agreement on behalf of the plaintiff. The court prior to the submission of these questions to the jury had entertained a motion by the defendant to dismiss the complaint, and also a motion of the plaintiff for the direction of a verdict, and had reserved decision of these motions, and, after these special questions were answered by the jury, the court directed a verdict for the plaintiff for the full amount of the notes, and from the judgment entered thereon the defendant appeals.

The answer itself does not allege that there had been a conditional delivery of the notes. The defendant admitted that he indorsed the notes, and then as a special defense alleges that for the accommodation of the defendant Maloney and the plaintiffs, and to indicate his assent to the payment thereof from the proceeds of sale of the mining stock, he indorsed the notes upon condition that the payment thereof should only be made out of the proceeds of sale of said mining stock, and that in no other way should payment of the notes be demanded or sought to be enforced against this defendant. Upon the trial the defendant testified: That he was informed of the fact that a special account had been opened to trade in cotton. That he understood that this account was opened for his benefit. That, as he understood the proposition, he thought that he was to get all the profits, and somebody else was to stand all the loss. That he was not to be liable for any losses. That after this loss had been incurred upon this account and in the latter part of September, 1906, he had an interview in New York with two of the plaintiffs and Maloney. That defendant then told the plaintiffs that he would make no settlement of the account; that he had never authorized the plaintiff to buy or sell any stocks or cotton for him; that on the 25th of August he had instructed Maloney to close out the account, and said that he wanted no profits in it and would pay no losses; that Maloney then stated that he had understood the defendant to say over the telephone that the plaintiffs should continue to trade on the account and not to close it out; that one of the plaintiffs then said:

"Well, then, it is up to Mr. Maloney. He has got to settle, and it means that he is going to lose his job, lose his position."

Defendant, in answer to this, told the plaintiffs that he was satisfied that Maloney intended to make some money for him on the deal and that his intentions were honest; that plaintiffs replied that if the defendant did not pay it Maloney would have to stand for it and lose his position; that defendant then said he did not want Maloney to lose his position; that he explained his mining proposition to them,

and said he thought there was a way, if they could handle this stock for him, or have Mr. Maloney handle it for him, there was a way of Maloney's paying the other money and keeping his position; that the meeting, however, came to an end without any definite understanding; that, in relation to plaintiffs renewing Maloney's contract with them, defendant said that he wanted plaintiffs to renew Maloney's contract or keep Maloney under contract with them for two or three years; that he did not want Maloney to lose his job for trying to make some money for him.

On cross-examination defendant testified that he had received notices over the telephone and from Maloney personally in relation to the purchases and sales included in this account; that subsequent to this meeting and on the 2d or 3d of October he saw Maloney and told him that if the plaintiffs would allow Maloney to handle this mining stock that he would pay the notes out of the first sales of stock; that Maloney then said he only wanted the notes as evidence that he was authorized to make the sale and apply the proceeds of the sale to the payment of the notes; that the notes should not leave Maloney's possession, but Maloney would hold them; that he (Maloney) had already sold 2,000 shares of the stock, so that there was no question about paying the notes out of the proceeds of the stock; that he need not be worried about the future or being called on to pay the notes. This testimony was objected to upon the ground that it was not within the pleadings and related to a defense not pleaded. The court then stated that it would strike out the testimony in regard to Maloney agreeing not to part with the note, when defendant moved to amend the answer, to which plaintiffs' counsel objected on the ground that it was a new and separate defense. The court then stated it would receive the testimony with the privilege to the defense to amend their answer to conform to the proof at the close of the trial to which plaintiffs' counsel excepted. The witness then testified that, relying on this statement by Maloney, he indorsed the notes and delivered them to Maloney; that the notes were in his handwriting, signed by Maloney and indorsed by himself; that a few shares of the mining stock were sold by Maloney, but that the defendant received no money either from the plaintiffs or from Maloney on account thereof; that defendant indorsed these notes in consideration of Maloney's statement that he had already sold 2,000 shares of the mining stock at $7.50 per share and upon Maloney's assurance that he would not let these notes out of his hands.

The defendant then produced a contract with Maloney, which was executed on the 7th day of December, 1905, over two months after the notes in suit were given between the defendant Hoadley, as party of the first part, and Maloney, of the second part, by which Maloney agreed to undertake to sell, or cause to be sold, 30,000 shares of the capital stock of this mining company at not less than $——— per share; acknowledging receipt of three promissory notes signed and indorsed by said Maloney and indorsed by Hoadley aggregating $6,805, and payable in four, eight, and twelve months. "Said notes being in full payment of account of Fred Williams with Carpenter, Baggot & Co., and a full release as against said Hoadley for all accounts and demands to date. It being understood that the indorsement of said

Hoadley of said notes is in consideration of said Maloney's agreement to undertake the cause of the sale of said stock at $——— per share." The agreement then provides for the sale by Maloney of this stock and the application by him of the proceeds thereof to the payment of the notes in question and the payment of the balance of the proceeds to Hoadley; that Maloney in entering into the contract enters into it in his own personal capacity, and not as an agent or representative of the plaintiffs.

Whatever agreement was entered into at the time the notes were indorsed, I think that this subsequent agreement between Maloney and the defendant entirely changed the situation. If there was a conditional delivery of the notes to Maloney at the time they were executed, by this agreement, for a valid consideration, the notes then became existing, enforceable obligations in the hands of Maloney given to expressly carry out the arrangement that defendant suggested to the plaintiffs at the interview in New York in September which would provide for the payment of the notes and thus enable Maloney to retain his position with the plaintiffs and prevent the discharge of Maloney from plaintiffs' employ, a condition which Hoadley expressly told the plaintiffs he desired to avoid. Hoadley does not dispute the binding force of this agreement. He produced it himself upon the trial, and it was introduced in evidence. There is nothing in this agreement that limits the obligation upon the notes so that the defendant should not be liable on them unless the proceeds of the sale of the stock was sufficient to pay the notes. By it Maloney admitted the receipt of these notes indorsed by the defendant Hoadley and agreed with Hoadley that:

"Said notes being in full payment of account of Fred Williams with Carpenter, Baggot & Co., and a full release as against said Hoadley for all accounts and demands to date. It being understood that the indorsement of said Hoadley of said notes is in consideration of said Maloney's agreement to undertake the cause of the sale of said stock at $——— per share."

After the execution of this agreement, the notes were relieved from any prior understanding or condition upon which they were executed and delivered. If the notes had been given at the time of the execution of this agreement and in accordance with its terms, it is clear that it would be no defense to the notes in the hands of a third party that Maloney had been unable to sell any of this stock. If there was a violation of any undertaking of Maloney to sell the stock by which the defendant sustained damage, it is possible that he might have alleged the violation of the agreement and the damages sustained by way of counterclaim or offset upon the amount due on the notes. But no such counterclaim or offset was alleged in the answer. After the execution of this agreement, therefore, the notes were in the possession of Maloney under a valid agreement as between himself and Hoadley by which the obligation that Hoadley assumed upon the notes was to release him from all claim by the plaintiffs or Maloney on this Fred Williams account. The notes being thus absolute obligations, the condition agreed to at the time of the making and delivering of the notes to Maloney was waived, and Maloney became entitled to dispose of the notes and transfer them to the plaintiff in discharge of the Wil-

liams account, and the plaintiff would thus be entitled to enforce them. Whatever had happened before upon the execution of this agreement, these notes became existing obligations payable as prescribed upon their face, and both the maker and indorser then assumed the obligation expressed in the notes themselves.

I do not think that evidence as to this alleged conditional delivery of the notes was available to the defendant upon this trial. As before stated, the answer did not specially allege a conditional delivery. When it was first attempted to prove such a conditional delivery, it was objected to as not within the defense set up in the answer; but the court received the evidence and allowed the defendant to move to amend the answer. To this the plaintiffs excepted. At the end of the defendant's case, counsel for the defendant moved to amend the answer by alleging that at the time of the delivery of the notes Maloney agreed with defendant Hoadley that he would retain such notes in his possession and under his control; that under no circumstances were these notes to be delivered out of his possession; and that said notes should be paid entirely and solely out of the proceeds of the sale of stock of the mining and smelting company and in no other way. This amendment was objected to upon the ground that it set up a new defense and the court had no power to make it upon the trial. The objection was overruled, and the amendment granted, to which the plaintiffs excepted. The defense as originally pleaded was that, although the note was given absolutely on its face, it was agreed that it should not be paid as the writing expressed, but in a different way.

Undoubtedly upon the defense as it stood the evidence as to any conditional delivery was inadmissible. The amendment sought to interject into the case upon the trial the defense of a conditional delivery, and that I do not think the court had power to allow. It is now settled in this state that evidence allowing a maker or indorser of a promissory note to avoid his contract, because of a contemporaneous oral agreement that the note should not be paid according to its terms, is incompetent as tending to vary or change a written instrument. See Jamestown Business Ass'n v. Allen, 172 N. Y. 291, 64 N. E. 952, 92 Am. St. Rep. 740, where the question is fully discussed. There the defense relied upon was that the note was to become void upon the happening of a future event, and it was held that such an agreement could not be proved to defeat the obligation assumed by the execution and delivery of the note. The court there defines a "conditional delivery" to be one by which the note was not to be regarded as delivered until the happening of a future event. But where the note was actually delivered, and to be a valid instrument until a future event should occur when upon a contingency it should become void, there was not a conditional delivery. To set up the defense of a conditional delivery was the interposition of a new defense on the trial, and it was, I think, error to allow the amendment. The defendant indorsing Maloney's own note and delivering it to Maloney before any liability could arise, the parties must have contemplated that the note should be delivered to a third party. The former relation of Hoadley to Maloney and the plaintiffs clearly show to whom it was understood this note was to be

ultimately delivered, and, when described as given to discharge Hoadley's obligation to the plaintiffs and as a full release of Hoadley's for all accounts and dividends to date, Hoadley became liable on the notes when delivered to plaintiffs and received by them in discharge of Maloney's and Hoadley's obligations.

I think, therefore, the court below was quite right in directing a verdict for the plaintiffs upon the testimony, and that the judgment appealed from should be affirmed.

McLAUGHLIN, J., concurs.